IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re: ) | Case No. 24-30010 |
| ) | (Chapter 11) |
| RED RIVER SUBS, INC. ) | |
| ) | |
| Debtor. ) | |
| _____) | |

### RED RIVER SUBS, INC.'S AMENDED
### SUBCHAPTER V PLAN OF REORGANIZATION

Comes now Red River Subs, Inc. ("Red River Subs" or the "Debtor"), by and through undersigned counsel, pursuant to the rigors of Official Form 425A, and provides the following plan of reorganization (the "Plan") herein:

### Background for Cases Filed Under Subchapter V

a. **Description and History of the Debtor's Business**

The only Erbert and Gerbert's franchisee in North Dakota, Red River Subs was formed in November 2004 and currently operates two locations in Fargo and one location in Moorhead. Originally owned and operated by a cadre of individuals, the Debtor was consolidated under the helm of Todd Beedy just prior to the COVID-19 pandemic and has endured in delivering high quality sandwiches, in a quirky and family-friendly environment, through the ensuing years of tumult in the restaurant industry.

There were – not that long ago – six Red River Subs locations. But a steep rise in food costs and a populace with ever-shifting dining habits saw that number halved in the years preceding the filing of this case, with the Debtor's most distant locale, in Bismarck, being shuttered shortly pre-petition. Whether a downsizing or a "right-sizing," the consolidation of locales has permitted Red River Subs to concentrate energies on three strong stores, synergizing operations and amplifying an enduring commitment to quality. Unprofitable locations have been left behind in recent years, with onerous lease obligations accordingly shed and the finest employees placed into a trifecta of eateries.

While no one factor directly precipitated Red River Subs' need to reorganize, it is not difficult to correlate the aforementioned rising food costs to thinning margins. Nor is it difficult to see how a large debt obligation, incurred to finance the exit of the entity's previous owners, created a crushing economic burden. And there is also a tragic ease in looking at the deleterious impact of third party delivery services on the margins of a restaurant chain that for so long has made its own deliveries without having to share proceeds beyond tipped wages.

So, on January 13, 2024, the Debtor sought Chapter 11 relief. In the ensuing three months, Red River Subs has shown an ability to operate profitably when not hindered by aged debt obligations, though the margins remain far thinner than the company's cold cuts. This is not a case where some operational epiphany appears likely to beget generous revenues; this is a case where sandwich shops named for a Garden Stater, a protruding gut, the New York City public transit

1

system, and a grinning moose will continue to apply competitive pressure on the region's Erbert and Gerbert's locales.

It follows, unfortunately, that while this Plan will leave priority creditors in better shape than would a Chapter 7 liquidation, the Debtor is not in a position to propose a meaningful distribution to general unsecured creditors. Just paying the claims of taxing authorities, a secured creditor, and landlords will consume Red River Subs' projected disposable income for the life of this Plan. And while such will inure to the benefit of a loyal cadre of employees, the numerous patrons who cherish the Debtor's product, and those aforementioned prioritized creditors (especially the landlords, who have proven markedly patient and graceful throughout the whole of this case), Red River Subs feigns no joy in proposing a Plan that leaves behind general unsecured creditors.

    b. **Liquidation Analysis & Secured Claim Valuation**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a Chapter 7 liquidation. The Debtor entered bankruptcy with $94,812.65 in assets, the whole of which serve as security for one creditor's oversized claim. In a Chapter 7 liquidation, there would be nothing to distribute to any other creditors and, absent a carve out arrangement, it is not clear that a trustee would even endeavor to sell assets for the benefit of that one secured party.

The Debtor is now asserting the lone secured creditor has a secured claim of $62,905.15 – not $94,812.65. The reduction of this claim is based upon the Debtor's analysis of the monies that would actually be fetched if Red River Subs' assets were liquidated. The analysis posits (i) cash on hand of $26,653.85 should not be discounted; (ii) short-term accounts receivable of $13,148.80 (being in the nature of overnight credit card sales) should not be discounted; (iii) perishable inventory of $18,810.00 should be discounted at the rate of 75%, to $4,702.60, in light of the pragmatic and legal obstacles attendant to liquidating food and beverage inventory (proverbial "melting ice cubes"); (iv) the Debtor's fire safe, valued at $600.00, would be likely to sell for that sum, without discount; (v) the Debtor's other restaurant equipment valued at $32,100.00, in notably used condition, should be discounted at the rate of 50%, to $16,050.00, insofar as it is not clear what, if any, efficient market exists for such goods; and (vi) the Debtor's claim for $3,500.00, against a third party, should be discounted at the rate of 50%, to $1,750.00, to account for costs of collection. These discounts reduce the secured claim by $31,907.50, from $94,812.65 to $62,905.15. These discounts also evidence the likely total monies that would be paid out in a Chapter 7 case, even if a trustee agreed to liquidate assets solely for the benefit of a secured creditor.

In this Plan, the Debtor proposes to make $137,704.29 in payments over a five year period. This will leave certain creditors in a position superior to what would be occasioned by a Chapter 7 liquidation, while leaving *all* creditors in a position no worse than what would be occasioned by such a liquidation.

    c. **Ability to Make Future Plan Payments and Operate Without Further Reorganization**

The Debtor must also show that it will have enough cash over the life of the Plan to make the required Plan payments. Forward-looking financial projections for the Debtor are attached

hereto as **Exhibit A**. These figures show that the Debtor will have projected disposable income (as defined in § 1191(d) of the Bankruptcy Code), remaining after the payment of administrative expenses addressed below, for the period in § 1191(c)(2).

For the avoidance of doubt, the restaurant business is notoriously difficult, unaided by rising product costs and a general decline in consumer spending habits. The projections attached to this Plan are made in good faith and rooted in empirical, historical data points. But these are not guarantees and, even more so than with most businesses, are speculative to a necessary degree. The Debtor is resolved to make best efforts toward a successful reorganization, and believes creditors are uniformly aided – not hampered – through such efforts. But the Debtor is also acutely aware that a further spike in costs, or a failure of sales to rise in accord with inflationary measures, could change ink from black to red and invite a return to this Honorable Court.

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

**Article 1.     Summary**

This Plan under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") proposes to pay creditors of the Debtor from the general cash flow of the Debtor.

The Plan provides for:   1 class of a secured claim;

1 class of priority, unsecured claims;

3 classes of non-priority, unsecured claims; and

1 class of an equity holder.

Non-priority unsecured creditors holding allowed claims will not receive distributions. The Plan also provides for the payment of administrative priority claims other than those placed in classes.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

**Article 2.     Classification of Claims and Interests**

| | | |
|---|---|---|
| **Section 2.01** | **Class 1** | The secured claim of First Community Credit Union. The unsecured portion of this creditor's claim is placed in Class 4, and this creditor is thusly regarded as holding two claims. |
| **Section 2.02** | **Class 2** | The claims of Sysco Corporation and Coca Cola Bottling Company High Country, both of which were paid, in full, pursuant to a critical vendor order of this Honorable Court. |
| **Section 2.03** | **Class 3** | The claims of lease and contract counterparties whose leases and contracts are being assumed hereunder. |
| **Section 2.04** | **Class 4** | All general unsecured claims, except for that of Todd Beedy. |

3

| | | |
|---|---|---|
| **Section 2.05** | **Class 5** | The unsecured claim of Todd Beedy. |
| **Section 2.06** | **Class 6** | The Debtor's equity interest. |
| **Section 2.07** | **Class Identification** | A schedule of each class and its constituent creditors is appended hereto as **Exhibit B.** The total size of the non-disputed claims (or, where applicable, the non-disputed portion of claims) in each class is as follows: |

        Class 1: $62,905.15

        Class 2: $0.00

        Class 3: $34,904.89

        Class 4: $315,724.53

        Class 5: $232,421.80

The total undisputed secured claims total $62,905.15. The total undisputed unsecured claims total $594,787.91.[1]

**Article 3.**    **Treatment of Administrative Expense Claims and Court Costs**

| | | |
|---|---|---|
| **Section 3.01** | **Unclassified Claims** | Under § 1123(a)(1) of the Bankruptcy Code, certain administrative expense claims are not in classes. |
| **Section 3.02** | **Administrative Expense Claims** | Each holder of an administrative expense claim allowed under § 503 of the Bankruptcy Code will be paid in full on the effective date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor. All professionals including the Debtor's counsel and the Subchapter V Trustee will need to file applications with the Court to seek approval of their fee and expenses as allowed administrative expense claims within 30 days of the Effective Date. Any allowed administrative expense claim will be paid directly by the Debtor within five (5) business days of an order allowing such claim becoming a final order, unless the holder of such claim agrees otherwise. The Debtor's counsel has agreed to be paid any allowed administrative expense claim within 10 months of the Effective Date, with such |

---

[1] This number includes the non-classified claims of state and federal taxing authorities.

|  |  |  |
|---|---|---|
|  |  | payments being projected on the schedule of payments attached hereto as **Exhibit C**. The Debtor is cautiously optimistic that the Subchapter V Trustee's claim will be covered by the retainer monies being held by the Subchapter V Trustee. Post-petition, the Subchapter V Trustee shall continue to apply for all fees in accordance with Sections 330 and 331. |
| **Section 3.03** | **Priority Tax Claims** | Each holder of a priority tax claim will be paid in full not later than January 12, 2029. Amortization schedules for the claims of the Internal Revenue Service and Minnesota Department of Revenue are attached hereto as **Exhibits D and E**. Priority tax claims will accrue interest at the rate of 8% per annum, from the petition date, until retired. |
| **Section 3.04** | **Statutory Fees** | There are no statutory fees due in this case. |
| **Section 3.05** | **Prospective Quarterly Fees** | There are no prospective quarterly fees that will be due in this case. |

**Article 4.**   **Treatment of Claims and Interest Under the Plan**

| Class | Impairment | Treatment |
|---|---|---|
| Class 1 – First Community Credit Union | Impaired | Class 1 consists of the secured portion of the claim of First Community Credit Union. This class is impaired, inasmuch as the plan seeks to alter the terms upon which this debt will be paid. The Debtor will pay this obligation through monthly payments in conformity with Exhibit C. ~~The Debtor will pay this obligation through irregular monthly payments during the life of this Plan, commencing in June 2025~~. Projected monthly payments are set forth in Exhibit C. An amortization schedule for the Class 1 claim, premised upon an 8% interest rate, is attached hereto as **Exhibit F**. Further, on the date of the last payment to First Community Credit Union, in addition to (and not in lieu of) making the subject payment, the Debtor will present First Community Credit |

5

| | | |
|---|---|---|
| | | Union with a promissory note for $20,000.00, secured by First Community Credit Union's existing UCC lien, to be paid over the course of one calendar year, on a monthly basis, in twelve equal payments. The note will bear interest at the rate of 8% per annum. Each monthly payment will be in the amount of $1,739.77. The note will contain standard provisions, including governance under North Dakota law and a five day cure period should notice of any missed payment be given to the Debtor. This additional payment obligation is the byproduct of a compromise between the parties and is designed to ensure the compromise not impact the interests of any other party in interest. |
| Class 2 – Critical Vendors | Unimpaired | This class consists solely of the claims of Sysco Corporation and Coca Cola Bottling Company High Country, the two entities designated as critical vendors in this case and, pursuant to such designation, paid in full during the pendency of this case. Since neither of these entities has a remaining pre-petition claim, this class has no extant claims to be paid under this Plan. |
| Class 3 – Assumed Contract and Lease Counterparties | Impaired | This class consists of the claims of DFI 300 Broadway LLC; Westwood Management, LLC; Provident Partners, L.L.C., and E & G Franchising Systems, Inc.<br><br>The Debtor intends to enter into new lease agreements with each of the first three parties, post-confirmation; the terms of those new lease agreements will govern the payment of these claims. Should such new lease agreements not be entered into prior to |

6

|  |  |  |
|---|---|---|
|  |  | the Effective Date, the Debtor will pay the arrearage owed each of these landlords in equal monthly installments over 12 months, commencing on the first business day of the first calendar month succeeding the Effective Date. As discussed in Article 7, *infra*, this will require a monthly payment in excess of what the Debtor's projections otherwise permit. A third party has agreed to contribute the monies needed to cover the delta between the Debtor's projected disposable income during these 12 months and the monies needed to pay these claims. This contribution is *not* a loan and is not made in exchange for an equity interest. |
|  |  | The Debtor does not believe any monies are due and owing to E & G Franchising Systems, Inc. (the "Franchisor"). However, to the extent it is later determined any monies are due and owing to the Franchisor, through the filing of an allowed claim, the Debtor will pay such claim in equal monthly installments over 12 months, commencing on the first business day of the first calendar month succeeding the Effective Date. |
| Class 4 – General unsecured creditors | Impaired | This class consists of all allowed non-priority unsecured claims, except for the allowed unsecured claim of Todd Beedy. This class shall take nothing under this Plan. |
| Class 5 – Todd Beedy | Impaired | This class consists of the unsecured claim of Todd Beedy. This class shall take nothing under this Plan |
| Class 6 – Equity Interest | Unimpaired | Todd Beedy shall retain his equity interest in the Debtor on the Effective |

7

Date, though he shall be free to sell said equity interest at any time thereafter.

### Article 5. Allowance and Disallowance of Claims

**Section 5.01  Disputed Claim.** A *disputed claim* is a claim that has not been allowed or disallowed and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

**Section 5.02  Delay of Distribution of Disputed Claims.** No distribution will be made on account of a disputed claim unless such claim is allowed by a final, non-appealable order.

**Section 5.03  Settlement of Disputed Claims.** The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**Section 5.04  Anticipated Disputed Claims**. The Debtor will file an objection to the claim of the Internal Revenue Service within ninety (90) days of the Effective Date of this Plan. The Debtor does not presently anticipate objecting to any other claims herein, but reserves his right to do so. Any such claim objection must be filed by the Debtor within ninety (90) days from the effective date of this Plan (as defined in Section 8.02 hereof), *except* any objection to the claim of any governmental tax creditor may be filed at any time within ninety (90) days of the date on which such claim is filed.

### Article 6. Provisions for Executory Contracts and Unexpired Leases

**Section 6.01  Assumption.** The Debtor assumes the executory contracts and unexpired leases with (i) DFI 300 Broadway LLC; (ii) Westwood Management, LLC; (iii) Provident Partners, L.L.C.; and (iv) the Franchisor. The Debtor also assumes all executory contracts and unexpired leases for (i) the provision of utility services to any building occupied by the Debtor; (ii) the provision of utility services to the Debtor; (iii) the provision of merchant loyalty rewards, whether in the form of points, coupons, or otherwise, to the Debtor; and (iv) the provision of insurance to the Debtor.

**Section 6.02  Cure Payments.** Consistent with the provisions of Article 4 hereof, the Debtor will *not* make complete cure payments, to the counterparties of assumed executory contracts and unexpired leases, on the Effective Date. The Debtor will, rather, make such payments in equal installments over a period of one year, commencing on the first business day of the first month succeeding the Effective Date. For purposes of Section 365(b)(1)(A) of Title 11 of the United States Code (the "Bankruptcy Code"), the Debtor submits that the temporally-prioritized payment of these arrearages under this Plan, coupled with the Debtor's healthy post-petition financial performance and timely making of post-petition rent payments, constitutes "adequate assurance" of the cure payments being made. The Debtor equally submits that in the prism of this case, a one year cure period is "prompt" in nature.

**Section 6.03 Rejection.** The Debtor rejects all executory contracts and unexpired leases not assumed in Section 6.01 hereof.

**Article 7. Means for Implementation of the Plan**

The Debtor will continue to operate two restaurants in Fargo, North Dakota and one restaurant in Moorhead, Minnesota, so as to generate the revenues necessary to implement this Plan. The margins are thin, but Red River Subs believes the projected payments to be feasible in nature and is committed to performing under this Plan so as to realize the proverbial "fresh start" promised by the bankruptcy process.

In light of the seasonal and variable nature of the Debtor's income, payments will be in periodically-varied sums, as projected on **Exhibit C**. Most notably, Class 1 creditor will receive a lower-than-normal payment in July 2025 and a higher-than-normal payment in June 2026. These deviations are accounted for in the amortization schedule attached as **Exhibit F**.

Transparently, the Debtor will *not* have sufficient revenues to make the cure payments called for during the first year of this Plan – especially during the ten months when administrative expense claims are also to be made to case professionals. This issue may be vitiated as the Debtor enters into new leases with its landlords, as there is some hope the cure payments may be subsumed within those leases on more favorable terms. However, to the extent such leases are not successfully negotiated, a third party has offered to furnish the Debtor with monies sufficient to make these extra payments during the first year of the Plan. The Debtor is prepared to share additional details with the United States Trustee as well as the Subchapter V Trustee and, upon entry into a non-disclosure agreement, with counsel for any parties in interest. The Debtor is also prepared to share such details with this Honorable Court, *in camera*. The third party benefactor, however, has asked to not otherwise be publicly revealed.

**Article 8. General Provisions**

**Section 8.01 Definitions and Rules of Construction.** The definitions and rules of construction set forth in §§ 101-02 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan.

**Section 8.02 Effective Date.** The effective date of this Plan is the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay expires or is otherwise terminated.

**Section 8.03 Severability.** If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**Section 8.04 Binding Effect.** The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors, assigns and/or receiver(s) of such entity.

**Section 8.05   Default.** Should there occur a default under this Plan, creditors will have all rights provided for in the Bankruptcy Code (including Section 1112 thereof, inclusive of its allowances for the bringing of a motion to convert this proceeding to one under Chapter 7 of the Bankruptcy Code) as well as the right to seek recourse for breach of contract together with such remedies as this Honorable Court may deem just and proper, sitting as a court of equity; such rights will also vest in any interested parties with Article III standing to pursue such rights. A default hereunder shall be deemed to occur if the Debtor fails to make any payment provided for by this Plan, in the full amount so provided, and does not cure such failure within thirty (30) days of being given written notice of said failure by a party in interest. A default shall also be deemed to occur if the Debtor materially violates any substantive provision of this Plan.

**Section 8.06   Disbursing Agent.** There shall be no disbursing agent hereunder and the Debtor will make all payments to creditors directly, by check or, where available, direct deposit or auto-debit.

**Section 8.07   Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**Section 8.08   Controlling Effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of North Dakota govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**Section 8.09   Escheat.** If any distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder entitled thereto, such unclaimed property shall be forfeited by such holder.  Unclaimed property shall be (i) first paid to other members of the class of the claimant not claiming said distribution, until such a time as said class is paid in full; (ii) second paid to each junior class, until all classes are paid in full; and (iii) then, if and when each class is paid in full, remaining funds shall be donated to the University of Miami School of Law Bankruptcy Clinic, to be administered by Patricia Redmond, Esq. in the charitable manner she sees most fit. The University of Miami School of Law Bankruptcy Clinic works with members of the South Florida legal community to provide *pro bono* services to persons in need of bankruptcy relief, while also furnishing law students with valuable pedagogical experience in the field of bankruptcy law.

**Section 8.10   Retention of Jurisdiction.** The United States Bankruptcy Court for the District of North Dakota shall retain jurisdiction of this Chapter 11 case to issue orders necessary to the consummation of the Plan; to determine the allowance of compensation and expenses of professionals; to determine any and all adversary proceedings, applications and contested matters; to determine issues or disputes relating to the assumption of executory contracts and any claims related thereto; to determine disputes as to classification or allowance of claims or interests; to issue such orders in aid of execution of this Plan to the extent authorized by § 1142 of the Bankruptcy Code; to enforce the provisions of the Plan; to recover all assets of the Debtor and property of the Debtor's estate, wherever located; to resolve any dispute between or among any of the parties to this bankruptcy proceeding, to determine other such matters as may be set forth in a confirmation order or as may be authorized under the provisions of the Bankruptcy Code; to enter a final decree closing the bankruptcy case; and to correct any defect, cure any omission or reconcile

any inconsistency in this Plan or confirmation order, and to take any action or make any ruling as may be necessary to carry out the purpose and intent of this Plan.

**Section 8.11   Modifications.** Modification of this Plan shall be governed by Section 1193 of the Bankruptcy Code.

**Section 8.12   Professional Fees.** Per Section 3.02 of this Plan, the Debtor must seek the approval of this Honorable Court prior to paying any professional fees incurred during the pendency of this case. Commencing on the Effective Date, however, the Debtor shall be free to pay any post-confirmation fees incurred by the Subchapter V trustee, counsel, or other professionals, without first obtaining leave of court, and such professionals shall thereafter be excused from any requirement to seek leave of court.

**Article 9.   Discharge**

**Section 9.01   Discharge.** The Court shall grant the Debtor a discharge pursuant to 11 U.S.C. § 1192 of all debts that arose prior to the Petition Date in this case, except any debt (1) on which the last payment is due after the first five (5) years of the Plan; and (2) debts of the kind specified in Section 523(a) of the Bankruptcy Code.

(a) If the Plan is confirmed under 11 U.S.C. § 1191 as a consensual plan, the Debtor shall receive a discharge on the effective date of the Plan; or

(b) If the Plan is confirmed under 11 U.S.C. § 1191(b), the Bankruptcy Court shall grant a discharge upon the completion of the plan payments being made in June 2029.

**Section 9.02   Effect of Discharge.** This discharge will be effective against all creditors of the Debtor given notice of this bankruptcy case and sent a copy of this Plan, together with their respective members, managers, insiders, shareholders, officers, directors, trustees and receivers.

**Article 10.   Retention of Certain Assets; Notice of Substantial Consummation**

**Section 10.01** Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, all rights arising under Chapter 5 of the Bankruptcy Code shall remain an asset of the Debtor's bankruptcy estate – and shall, accordingly, remain subject to the protections of Section 362(c)(1) of the Bankruptcy Code – to and through December 5, 2028, at which time said interest (should any remain) shall revest in the Debtor.

**Section 10.02** If the Plan is confirmed under 11 U.S.C. § 1191(a), the Debtor will file a Notice of Substantial Consummation not later than 14 days after the Plan is substantially consummated per 11 U.S.C. § 1183(c)(2).

11

*[Signature on Following Page]*

Respectfully Submitted,

/s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
THE DAKOTA BANKRUPTCY FIRM
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
mac@dakotabankruptcy.com
*Counsel for the Debtor*